Filed 12/16/24  P. v. Murray CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B332053 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA042564-02) |
| v. | |
| JONATHAN ALVIN MURRAY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge.  Affirmed.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and J. Michael Lehmann, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

Jonathan Alvin Murray appeals from the superior court's order denying his petition for resentencing under Penal Code section 1170.95 (now section 1172.6).[1] In 2013 a jury convicted Murray of first degree murder, and the trial court sentenced him to a prison term of 55 years to life. Murray appealed, and we reversed the judgment and directed the trial court to give the People the option of accepting a reduction to second degree murder or retrying the case. The People decided not to retry the case, and the court entered a conviction for second degree murder and sentenced Murray to 35 years to life.

After the Legislature amended the statutes defining murder, Murray filed a petition for resentencing. The court held an evidentiary hearing and found beyond a reasonable doubt Murray could still be convicted of murder under current law. Murray contends substantial evidence did not support the court's finding. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *Murray and His Brother Chase and Kill a Friend*
Murray and his brother Jason Cutler lived with their mother Bernadette Young. Chris Elmore, a friend of Murray's, also lived in Young's apartment. One late night in April 2008, Murray and Cutler began fighting with Elmore because he "disrespected" Young. The three men left Young's apartment and went into the street, where the altercation "escalated."

---

[1]      Statutory references are to the Penal Code.

2

According to a witness, Murray and Cutler appeared to be "attacking" and acting aggressively toward Elmore, who was saying, "Leave me alone" and "Come on, man. I'm leaving. I'm leaving." Murray picked up a metal pole and swung it at Elmore, who swung a cane at Murray in self-defense. Murray and Cutler returned to the apartment, retrieved knives from the kitchen, and went back out into the street. Meanwhile, Elmore continued walking down the street, away from Young's apartment.

Murray and Cutler ran after Elmore. Cutler caught up to Elmore first and stabbed him in the neck. Murray and Cutler ran back into Young's apartment, and according to a neighbor, Young said, "'Those are my sons. That guy disrespected me. They had to do what they had to do.'"

Elmore died from the knife wound in his neck. Investigators found the two knives from Young's kitchen within 16 feet of each other in a neighbor's yard; one had blood on it, the other did not. (*People v. Murray* (June 1, 2015, B252166) [nonpub. opn.].)

At trial, the People introduced the transcript of two interviews detectives conducted with Murray. The jury also heard a recording of the interviews, and one of the detectives testified about inculpating statements Murray made during the interviews. In the first interview, four days after the murder, Murray told the detectives, "I'm just going to . . . put it out there, man. You know, my mom didn't have nothing to do with it. You know, it was me and my brother." Murray said that he got into a fight with Elmore because Elmore "disrespected" his mother and that the fight moved to the street, where Murray hit Elmore with a pole when Elmore swung his cane at Murray; Cutler also went out into the street and "was just watching." According to Murray,

the fight lasted only a few minutes before Young told him to go back inside the apartment. Murray stated that he and Cutler each grabbed a knife from the kitchen and that they both "ran after" Elmore. Murray said that, when he was on the street and saw Cutler running, he said to himself, "I fucking can't do this" and went back inside Young's apartment. Murray claimed he did not know anything about what Cutler did.

In the second interview a month later, Murray explained to the detective that he believed the prosecutor would charge him with accessory to murder: "I was there. I had a knife. . . . My brother had a knife and it, it happened." Murray stated "everything" would "pinpoint" to him because Cutler was his "crimey." Murray admitted, "You know, my intention was to kill his ass. That was my intention, 'cause he said that shit to my momma. My mom took him in. You know, he [was] running from his gun charge. My mom took him in and . . . I was about to kill him." Murray also said, "You know. And me and my brother ran down there, I was about to kill him. That was my intention, you know." The detective summarized Murray's statements back to him, "So, you're telling us your intent was to kill him, but you didn't kill him. [Cutler] did." Murray responded, "He caught up to him faster than I could."

B.     *The Jury Convicts Murray of Murder, the Trial*
       *Court Sentences Him, and Murray Appeals*

The trial court instructed the jury on first degree murder as an aider and abettor with CALJIC No. 3.01 and on the natural and probable consequences doctrine with CALJIC No. 3.02. The jury convicted Murray of first degree murder and, in a bifurcated proceeding, Murray admitted he had a prior conviction that was a

serious felony within the meaning of section 667, subdivision (a), and a serious or violent felony within the meaning of the three strikes law (§§ 667, subds. (b)-(j); 1170.12, subds. (a)-(d)).  The trial court sentenced Murray to a prison term of 55 years to life: 25 years to life for first degree murder, doubled under the three strikes law, plus five years for the enhancement under section 667, subdivision (a).

Murray appealed, arguing the trial court erred in instructing the jury on the natural and probable consequences doctrine.  During the pendency of the appeal, the Supreme Court decided *People v. Chiu* (2014) 59 Cal.4th 155, which held a defendant cannot be convicted of first degree murder as an aider and abettor under the natural and probable consequences doctrine.  (*Id.* at pp. 158-159.)  Rather, the Supreme Court stated, the defendant's liability for first degree murder "must be based on direct aiding and abetting principles."  (*Id.* at p. 159.)[2]  We agreed with Murray, reversed the judgment, and directed the trial court to allow the People to accept a reduction of Murray's

---

[2]    The Supreme Court also held "punishment for second degree murder is commensurate with a defendant's culpability for aiding and abetting a target crime that would naturally, probably, and foreseeably result in a murder under the natural and probable consequences doctrine." (*People v. Chiu, supra*, 59 Cal.4th at p. 166.)  Following the Legislature's amendments in 2019 to the statutes defining murder, which we will discuss, a defendant may no longer be convicted of second degree murder under a natural and probable consequences theory.  (See *People v. Gentile* (2020) 10 Cal.5th 830, 851 [section 188, subdivision (a)(3), "bars conviction for second degree murder under a natural and probable consequences theory"].)

murder conviction to second degree or to retry the charge of first degree murder.  (*People v. Murray*, *supra*, B252166.)

On remand the trial court vacated Murray's sentence, and the People stated they did not intend to retry Murray on the first degree murder charge.  The court entered a conviction for second degree murder and sentenced Murray to a prison term of 35 years to life.

C.    *Murray Petitions for Resentencing Under Section 1172.6*

In 2021 Murray filed a petition for resentencing under section 1172.6.  Murray alleged the facts required under section 1172.6, subdivision (a), and requested counsel.  After the court appointed counsel to represent Murray, the parties filed briefs, and the court found Murray had made a prima facie showing for relief and issued an order to show cause.  The People filed an evidentiary brief, arguing the evidence at trial established Murray was a direct aider and abettor of murder. Murray filed a reply, arguing the evidence did not show he assisted Cutler during the stabbing "by cornering, holding, distracting, or touching Elmore in any fashion."

At the hearing on the petition the parties stipulated to the statement of facts from this court's opinion in Murray's direct appeal.  Counsel for Murray argued the evidence at trial did not show that the brothers planned to stab Elmore, that Murray had any physical contact with Elmore, or that Murray cornered or distracted Elmore.  Counsel argued the record did not indicate how far away Murray was when Cutler stabbed Elmore.  The prosecutor, citing Murray's admissions he intended to kill Elmore, argued the evidence established Murray directly aided

and abetted Cutler.  Regarding the actus reus element of aiding and abetting, the prosecutor argued Murray aided and abetted Cutler in "a number of ways," including encouraging his brother to catch up with Elmore and preventing Elmore from attempting to fight back.

The court stated it considered "what led up to the motive to get into the fight in the first place," that the brothers went back to the apartment to arm themselves with knives, and that they "then reengaged the victim after the victim specifically tried to leave and get away."  The court found the evidence showed Murray and Cutler "were working in concert," were both armed, and had the "same motives" when they both "took off after that victim before his death."  The court stated, "There is strength in numbers," and denied the petition.  Murray timely appealed.

## DISCUSSION

A.    *Section 1172.6 and the Standard of Review*

Effective 2019, the Legislature substantially modified the law governing accomplice liability for murder, eliminating the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder (*People v. Arellano* (2024) 16 Cal.5th 457, 467, 468; *People v. Curiel* (2023) 15 Cal.5th 433, 440 (*Curiel*); *People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*); *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*)) and significantly narrowing the felony-murder exception to the malice requirement for murder (§§ 188, subd. (a)(3), 189, subd. (e); see *People v. Strong* (2022) 13 Cal.5th 698, 707-708; *People v. Lewis* (2021) 11 Cal.5th 952, 957).  Section 188, subdivision (a)(3), now prohibits imputing malice based solely on an individual's

7

participation in a crime and requires proof of malice to convict a principal of murder, except under the revised felony-murder rule in section 189, subdivision (e).  (*Arellano*, at pp. 467-468; *Curiel*, at p. 449; *Gentile*, at pp. 842-843.)  Section 1172.6 authorizes an individual convicted of felony murder or murder under the natural and probable consequences doctrine to petition the superior court to vacate the conviction and to resentence the petitioner on any remaining counts if he or she could not now be convicted of murder because of the legislative changes to the definitions of the crime.  (See *Curiel*, at pp. 449-450; *Strong*, at p. 708; *Lewis*, at p. 957; *Gentile*, at p. 843.)

If a section 1172.6 petition contains all the required information, the court must appoint counsel to represent the petitioner if requested.  (*People v. Lewis, supra*, 11 Cal.5th at pp. 962-963; see § 1172.6, subd. (b)(1)(A), (b)(3).)  The prosecutor must then file a response to the petition, the petitioner may file a reply, and the court must hold a hearing to determine whether the petitioner has made a prima facie showing he or she is entitled to relief.  (§ 1172.6, subd. (c); see *Curiel*, *supra*, 15 Cal.5th at p. 450.)

If a petitioner establishes a prima facie case for relief, the superior court issues an order to show cause, and the matter proceeds to an evidentiary hearing "at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill [No.] 1437."  (*People v. Strong*, *supra*, 13 Cal.5th at p. 709; see § 1172.6, subds. (c), (d)(3); *People v. Harris* (2024) 105 Cal.App.5th 623, 631-632.)

"While the superior court acts as an independent fact finder in determining whether the People have met their burden, on

appeal, the reviewing court applies the substantial evidence standard to the superior court's findings." (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951; see *People v. Arnold* (2023) 93 Cal.App.5th 376, 383.) "Under this standard, we review the record ""in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.""" (*Reyes*, *supra*, 14 Cal.5th at p. 988; see *People v. Hill* (2024) 100 Cal.App.5th 1055, 1066; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) We presume """"every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.""" (*Hill*, at p. 1066; see *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) In conducting this review, """"[w]e resolve neither credibility issues nor evidentiary conflicts.""" (*People v. Schell* (2022) 84 Cal.App.5th 437, 442.) """Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.""" (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476.)

### B. *The Superior Court Did Not Err in Denying Murray's Petition*

#### 1. *Applicable Law*

"Murder, whether in the first or second degree, requires malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 844; see § 187, subd. (a); *People v. Thomas* (2023) 14 Cal.5th 327, 385.) "Second degree murder is an unlawful killing with malice aforethought, but without the premeditation or deliberation

9

required for first degree murder." (*In re Ferrell* (2023) 14 Cal.5th 593, 600; see *People v. Morales* (2020) 10 Cal.5th 76, 88 ["If the murder is 'willful, deliberate, and premeditated,' it is first degree murder."].) Malice "may be express or implied." (§ 188, subd. (a); see *People v. Soto* (2018) 4 Cal.5th 968, 974.) "It is express when there is a manifest intent to kill." (*Gentile*, at p. 844; see § 188, subd. (a)(1); *People v. Swain* (1996) 12 Cal.4th 593, 601 [one theory of second degree murder is "unpremeditated murder with express malice"]; *People v. Coley* (2022) 77 Cal.App.5th 539, 547 [same].) "Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*Reyes*, *supra*, 14 Cal.5th at p. 988; see *People v. Pittman* (2023) 96 Cal.App.5th 400, 414.)

"'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea.'" (*Reyes*, *supra*, 14 Cal.5th at pp. 990-991; see *People v. McCoy* (2001) 25 Cal.4th 1111, 1118.) Direct aiding and abetting "requires that 'the aider and abettor . . . know and share the murderous intent of the actual perpetrator.'" (*Gentile*, *supra*, 10 Cal.5th at p. 850.) "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 560; see *Curiel*, *supra*, 15 Cal.5th at p. 463 ["'an accomplice is guilty of an offense perpetrated by another [e.g., murder] if the accomplice aids the commission of that

10

offense with "knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends""'"].) "'The aider and abettor doctrine merely makes aiders and abettors liable for their accomplices' actions as well as their own. It obviates the necessity to decide who was the aider and abettor and who [was] the direct perpetrator or to what extent each played which role.'" (*People v. Gomez* (2018) 6 Cal.5th 243, 279.)

"Aiding and abetting may be shown by circumstantial evidence." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599.) "'Factors to be considered by the trier of fact in determining "whether one is an aider and abettor include presence at the scene of the crime, failure to take steps to attempt to prevent the commission of the crime, companionship, flight, and conduct before and after the crime."'" (*People v. Vargas*, *supra*, 84 Cal.App.5th at p. 955; see *Glukhoy*, at p. 599 ["Motive is another circumstance to be considered in determining aiding and abetting liability."].)

> 2. *Substantial Evidence Supported the Superior Court's Findings*

Substantial evidence supported the superior court's finding Murray could still be convicted of aiding and abetting second degree murder under current law. First, Murray admitted he acted with express malice. Referring to Elmore, Murray told the detectives his intention "was to kill his ass." Murray also knew Cutler acted with express malice because he saw Cutler retrieve a knife from Young's kitchen, leave the apartment, and run after Elmore. The brothers shared the intent to kill Elmore. (See *People v. Powell* (2021) 63 Cal.App.5th 689, 716-717

11

["the evidence supported a finding that [the defendant] shared the intent to kill with the stabber"].)  Second, Murray's actions, which mirrored Cutler's, showed he intended to assist Cutler in achieving Cutler's "unlawful ends" (*Curiel*, *supra*, 15 Cal.5th at p. 463), i.e., killing Elmore.  Though the record does not reflect what, if anything, the two brothers said to each other, Murray fully cooperated and acted in concert with Cutler.  The evidence supported the reasonable inference that each brother knew the other had armed himself with a knife (they both went into Young's kitchen to get one) and that Murray ran out the apartment with Cutler (a witness saw the brothers run in and back out together).  Third, Murray's actions supported and encouraged Cutler:  Murray and Cutler both attacked Elmore in front of Young's apartment, armed themselves with the same deadly weapons, chased Elmore, discarded their knives after Cutler stabbed Elmore, and returned together to Young's apartment after they completed their mission.  (See *People v. Glukhoy*, *supra*, 77 Cal.App.5th at p. 599 [brothers supported and encouraged each other as aiders and abettors where they together planned to commit car burglaries, stole a car and a truck, evaded law enforcement by taking turns driving recklessly, and fled the scene after a fatal crash].)

Contrary to Murray's assertion that Cutler stabbed Elmore "before [Murray] arrived and could provide Cutler with any assistance," Murray's statements showed he in fact arrived close to the scene of the stabbing, where his large physique and weapon, at a minimum, provided backup for Cutler.  Murray also supported and encouraged Cutler to catch up with Elmore by

12

running with him.[3] (See *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 296 ["Because [the defendant] was armed, his act of standing backup aided and encouraged [his codefendant] in shooting [the victims] by providing further deadly force in case the victims resisted."].) As Murray told the detectives, he "was about to kill" Elmore, but Cutler got there first. (See *People v. McCoy, supra*, 25 Cal.4th at p. 1120 ["When two or more persons commit a crime together, both may act in part as the actual perpetrator *and* in part as the aider and abettor of the other, who also acts in part as an actual perpetrator."].)

Murray argues he and Cutler "were acting independently, and not jointly, at the time Cutler fatally stabbed Elmore." The evidence, however, belies this characterization. As discussed, a witness saw the brothers attack Elmore in the street, go back into the apartment, return outside, run toward Elmore, and finally return to Young's apartment. The spatial and temporal proximity of Murray and Cutler to each other throughout most of their altercation with, and pursuit of, Elmore undermines Murray's assertion Cutler killed Elmore "entirely on his own." Young's statement her boys "had to do what they had to do" (presumably to defend her honor) shows she also viewed the killing as a joint enterprise. And Murray described the venture as a team effort: "It was me and my brother." Finally, as discussed, the factors to consider in determining whether Murray aided and abetted the murder are not limited to the precise moment Cutler drove his knife into Elmore's neck. Murray provided moral support to Cutler, his "crimey," before and after the stabbing, taking the exact same steps (albeit a bit slower)

---

[3] A detective testified Murray was six feet tall and weighed approximately 235 pounds at the time of the crime.

13

Cutler took to achieve their common goal of killing Elmore. (See *In re White* (2020) 9 Cal.5th 455, 464 [substantial evidence supported the court's finding the defendant aided and abetted the perpetrator's assault with intent to rape because, knowing the perpetrator's intent, the defendant did not stop the perpetrator, but instead told him to "'go and get her,'" acted as the "'lookout guy,'" and helped the perpetrator to flee].)

Murray also could still be convicted of second degree murder under an implied malice theory. "'In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*Reyes*, *supra*, 14 Cal.5th at p. 991; see *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 389-390.)

The evidence showed Murray knew Cutler intended to attack Elmore with a deadly weapon, intended to aid Cutler, knew the attack was dangerous to Elmore's life, and acted in conscious disregard of Elmore's life. As discussed, Murray knew Cutler took a knife from the kitchen drawer, which supported the reasonable inference Murray knew Cutler intended to attack Elmore with the knife (if not kill him). The evidence also showed Murray intended to aid Cutler in committing the assault when he

14

ran out of the apartment with Cutler, armed with a knife. Murray's admission he intended to kill Elmore and his decision to arm himself was substantial evidence he knew stabbing Elmore with a knife was dangerous to human life. In addition, Murray ran after Elmore, knowing Cutler was chasing Elmore too, which further showed a conscious disregard for Elmore's life. As for Murray's acts that aided Cutler in assaulting Elmore, the same evidence that supported Murray's liability as an aider and abettor to second degree express malice murder also supported his liability as an aider and abettor to second degree implied malice murder: encouragement, support, companionship, conduct before and after the crime, and flight. (See *People v. Vargas*, *supra*, 84 Cal.App.5th at p. 955; *People v. Glukhoy*, *supra*, 77 Cal.App.5th at p. 599.) Murray's pursuit of Elmore (even if he fell behind Cutler) encouraged Cutler, who could count on him for moral and physical support and assistance if necessary (if, for example, Elmore used his cane as a weapon again). Murray did nothing to dissuade Cutler, but instead armed himself with a knife and ran after Cutler. (See *People v. Schell*, *supra*, 84 Cal.App.5th at p. 443 [defendant's "presence at the scene, his participation in the attack on the victim, his companionship with other perpetrators, his conduct before and after the crimes, and his motive of retaliation for disrespect all support the finding that he aided and abetted an implied malice murder"].) As the superior court observed, the brothers had strength in numbers, and after the crime they both discarded their weapons in a neighbor's yard and returned home together, to the approval of their mother. Substantial evidence supported the court's conclusion that the brothers committed the murder in concert.

15

## DISPOSITION

The order denying Murray's petition under section 1172.6 is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

PULOS, J.*

---

\*     Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16